### HEARD NOVEMBER TERM, 1873.

## WHALEY *vs.* BANK OF CHARLESTON.

In an action to recover a money demand of a purely legal nature, no appeal lies from the finding of the Circuit Judge, upon questions of fact, the issues having been tried by him without a jury.

The construction and effect of written evidence presents matters of law which may be considered on appeal.

A bank published a resolution, of which A, a customer, had notice, that from and after the 6th September, 1861, " all credits will be given and payable in currency." A kept a pass book, in which the deposits were entered by the bank, and the credits by him. This book showed that on the 6th September, 1861, the balance in his favor, as then struck, was large ; that no change was made in the account, except that the later deposits were entered either as " currency deposit," or " Treasury notes ;" that balances were afterwards struck, the first on December 4th, 1861, and the last on February 18th, 1862 ; and that the account was continued until the 3d March, 1864, when the last credit was entered, the last deposit being of date 15th January, 1864. In an action by A against the bank to recover a balance alleged to be due, *Held* that the balance of the 5th September, 1861, which was then of value equal to gold, had not, by the resolution and the subsequent dealings between the parties, as shown by the entries in the pass book, been converted into a currency balance.

BEFORE GRAHAM, J., AT CHARLESTON, SEPTEMBER TERM, 1872.

This case will be understood from the judgment of the Circuit Judge, which is as follows :

GRAHAM, J. The plaintiff, for many years before and during the war a deposit customer of the Bank of Charleston, seeks to have his deposit account stated during the currency of Confederate Treasury notes.

The complaint is sworn to, and its leading statements are :

That plaintiff has been a depositor with the bank ever since its incorporation, in 1834, having large and regular balances to his credit.

That the account was last stated between him and the defendant on the eighteenth day of February, 1862, when there was due to him a balance in good money of thirty-three thousand four hundred and thirty-seven dollars and thirty-eight cents.

That until the fourth day of March, 1863, the credits in his pass-book continued to be made in the usual way. On that day a special entry was made of a deposit as " *Treasury Notes*," and from that time forward the dealings between plaintiff and defendant were exclusively in the notes of the Confederate States, and no account has been stated between them since February 18, 1862, when the balance was, as above stated, thirty-three thousand four hundred and thirty-seven dollars and thirty-eight cents.

The plaintiff admits that, notwithstanding the defendant received his deposits, and gave him credit as of good money, until the fourth day of March, 1863, yet that, by law, the defendant is entitled to show in accounting what was the real value of plaintiff's deposits from and after the sixteenth day of December, 1860, and the plaintiff is also entitled to show the real value of his receipts from the defendant, from and after the same date, and thereupon the plaintiff claims to have an account taken and stated accordingly, beginning from the last stated account prior to December 16, 1860, namely : The balance of November 13, 1860, $25,030.38, and continuing the same until the bank stopped, or the last entry in the account with the true value of such entry on either side, duly ascertained according to law, and that a balance thereupon be struck, and he demands judgment against the defendant for the sum of twenty-five thousand and thirty dollars and thirty-eight cents, the balance of account due in good money November 13, 1860, subject to being increased or diminished according to the result of the account prayed for.

He denies that there has been any account stated between them from the time of the special entry of " *Treasury Notes.*" This is the plaintiff's case.

The defenses set up by the answer are :

1st. That on the 6th day of September, 1861, the bank " adopted and published in the daily papers of the City of Charleston a reso-

lution, that from and after that date all credits will be given, and be payable in currency, in which term Confederate States Treasury notes are included; and that all deposits made by the said plaintiff after that date were in currency, and payable in currency."

"2. Denies that plaintiff's deposits, after September 6, 1861, were in good money; denies that they were entered as good money; and denies that the understanding of defendant was to account for the same in good money.

"3. Alleges that prior to April 1, 1864, the plaintiff drew, and the defendant paid, all moneys to his credit, and the account between them was closed. The defendant had not, on the first day of April, 1864, nor at any time since, any moneys belonging to the plaintiff."

During the pendency of the suit the plaintiff, Joseph Whaley, has departed this life, and his executor, William Whaley, has been made party plaintiff.

The plaintiff put in evidence two bank pass-books, containing the bank account from 1852 to March, 1864.

The deposit side is written by the bank officer, and the check side in the handwriting of the testator, with rare exceptions. So far as they go, these books contain the best evidence of the transactions between the bank and its customers.

The oldest book covers the period from 1852 to August, 1861, and by it there was then due to testator, November 13, 1860, $25,030.38. It had increased to $29,006.39 by January 2, 1861. The last deposit entered in this book is May 6, 1861, and there was then at the credit of testator $34,238.08. The last check is August 15th, 1861, leaving then a balance of $33,541.61. The new book is opened November 6, 1861, and the balance then brought forward is $33,481.96, a difference of $59.65 only from August to November. This was two months after the resolution of September 6, 1861. The facts thus drawn from the books make it very clear that, at the date of the resolution, the balance due by the bank could not be less than the balance of November 6, 1861, namely $33,481.96, a few dollars more than the balance of February 18, 1862, which plaintiff alleges was in good money. These facts may explain the reason of that allegation. The first deposit after the bank resolution is November 7, 1861, entered thus: "Currency, $2,500." By currency, it is suggested, bank bills are intended, Treasury notes not being in circulation till much later, but by referring to the pass-

book it appears there was no change in the manner of entering the credits. They are entered sometimes "currency," sometimes "deposits," as far back as the books reach (1852), and the same style of entry was continued until March 4, 1863, when, as charged in the complaint, the change was made to "Treasury notes," and so continued to the close of the book.

William Whaley, Esq., the present substituted plaintiff, testified that there never had been any settlement between the bank and testator, his father; that he knew that his father did not accept these payments as in good money, and when asked by the Court how he knew it, answered: Because all or most of his business was transacted entirely through him, and he knew it; that testator never accepted it (Confederate money) for more than it was worth; he never entertained the idea of receiving it as in full. Witness says: "I transact most of his business, and I testify that he never received these payments for more than they were worth."

Mr. Whaley also testified that his father caused Mr. ———— to write to the President of the bank at Greenville about his account, and in reply was informed that they did not know him. He was asked as to his conversations upon this subject with the late Mr. Sass, President of the bank, but I sustained the objection to his answering.

For the defense, Mr. Honour and Mr. Thayer, two bank officers, were examined.

They proved the destruction, at Columbia, of the personal ledger of the bank prior to April 1, 1864. Mr. Honour produced the personal ledger after that date, which, he stated, contained the accounts of all parties who had money to their credit in the bank on the 1st of April, 1864. Witness made up the book from books in the bank. Mr. Whaley's account is not in the book. It would be there if he had any balance. Mr. Thayer's testimony was substantially the same; both failed to make the testator a party to any settlement with the bank. Mr. Honour was asked, "If you know of any reason for saying that there was ever a settlement with Mr. Whaley in which he was a party, do state it."

He answered, "I do not know."

Mr. Thayer evaded a direct answer to similar questions. I think it must be assumed that Mr. Whaley was not a party to any settlement, and is not concluded from making the question as to the principle upon which the account shall be stated and the settlement

made. If, in fact, the transactions are partly in good money and partly in, or in reference to, Confederate money, and come within the terms of Sections 1, 2 and 3 of Chapter LV of the General Statutes, with respect to dealings in Confederate money, the question whether the balance was against the bank or against the plaintiff would only affect the result, not the principle, on which the account shall be stated.

The plaintiff urged the authority of *Boyden* vs. *The Bank of Cape Fear*, (No. Ca. Reps., Vol. 65, page 13 to 20), very earnestly. The case there made is, undoubtedly, very similar to this, and the judgment of the Court sustains the views of the plaintiff.

But that case, though entitled to great consideration, is not authority binding on me. I am not willing to commit this Court to the full extent of the general principles there adopted as to such cases. I prefer each case should rest upon its own particular circumstances. It is essential that the evidence in each case should bring it within the operation of Sections 1, 2, and 3 of Chapter LV of the General Statutes. In North Carolina the law as to scaling Confederate money transactions is similar to ours, and the Court, in the case referred to, ruled as *matter of law* that the account was to be divided, and the part prior to the circulation of Confederate Treasury notes estimated in par funds, and the part which involved deposits and checks in Confederate money was to be scaled. That case, in several respects, is entitled to attention. Mr. Justice Dick, in delivering the opinion of the Court, which seems to have been unanimous, says: "There was an ordinary deposit account running between the plaintiff and defendant before and during the war, and this action was brought by the plaintiff to adjust the matter and recover the net balance due him.

" If the mutual dealing between the parties had been in *par* funds there would have been no difficulty in ascertaining the *par* balance, as the books of the bank and the bank books of the plaintiff correspond in items and amounts.

" The ordinary relations subsisting at common law between a bank and its customers, on a general deposit account, is simply that of debtor and creditor." (Grant on Banking, 2.)

" The deposits are regarded as loans without interest to the bank, and the money goes into the general fund, and is used by the bank for its own benefit in its usual financial operations.

" As a compensation for such benefit there is an implied obliga-

tion on the part of the bank to honor and pay on presentation the checks and drafts of the customer until his deposits are exhausted, and also repay on demand of the depositor any balance which may be due on the settlement of the deposit account. The deposit, in the absence of any special agreement to the contrary, creates a debt, and the payments of the checks of the customer discharges such debts *pro tanto.* The bank or the customer may at any time discontinue their dealings, and the balance of the account between them can be easily ascertained by a single calculation.

"In our case different principles are involved which complicate the matter, as *par* funds and depreciated currency of varying values entered into the transactions of the parties. It was in evidence that, previous to the first of October, 1861, there were no deposits of Confederate currency, and the balance then due the plaintiff was in *par* funds. Subsequent to that date the dealings between the parties were in Confederate Treasury notes, which soon commenced to depreciate in value, and that fact was fully known and acted upon by both parties.

" These transactions in depreciated currency are, therefore, to be settled according to the Ordinance of the 18th of October, 1865, and the Acts of 1866, Chs. 38 and 39, as construed by several decisions of this Court. These deposits were in Confederate currency, and the plaintiff is entitled to their value at the time of deposit, to be ascertained by the scale."—Acts of 1867, Ch. 44.

"The payment of the checks and darfts of the plaintiff discharges *pro tanto* the debt created by his deposits."—*Brown* vs. *Faust,* 64 N. C., 672.

" When the final balance was struck in March, 1864, the defendant was not authorized by law to pay the balance due, 'in notes of like character and amount as those received,' but its implied contract was to pay funds equivalent in value to the funds deposited."— *Marine Bank* vs. *Chandler,* 27 Ills., 525; Story on Bail., 66; 28 Ills., 90, 360, 463; *Marine Bank* vs. *Fulton Bank,* 2 Wall., 252.

" The general rule in adjusting a running account between a bank and its customers, is 'the first money paid in is the first money paid out;' the first item on the debit side is discharged or reduced by the first item on the credit side.

"This rule is not strictly applicable to this case, as that part of the account which was in Confederate currency is not to be governed by principles of the common law, but is regulated by the legislation above referred to, which was enacted to meet such cases.

"The account must be divided, and the amount due October 1st, 1861, must be estimated in *par* funds.    To give full effect to the payments of the defendant, and allow to the plaintiff the proper value of his deposits, each payment ought to be deducted from the next preceding deposit or deposits, and when the deposits are in excess of the payments, then a balance ought to be struck, and the value of such excess ought to be ascertained, according to the scale, and form a part of the general · balance due the plaintiff; in this way the nominal amount of the payments will be deducted from the nominal amount of the preceding deposits, and this process can be continued until all the payments are allowed as credits.

"The value of the excess of the various deposits, at the time they were made, with the premiums added, will constitute the true balance of the Confederate currency transactions, and this sum, added to the amount of the *par* funds due October 1st, 1861, will constitute the amount due the plaintiff at the time of the demand made in March, 1864.    The defendant cannot justly complain of this arrangement, for the currency was rapidly depreciating, and his payments are taken out of previous deposits, which were of higher value."

If the judgment from which I have so freely extracted were in our own Court, I should be bound by it.    It would decide the case before me, but, as I have already said, I am unwilling to go so far as to say that, without special circumstances, such a bank account is as matter of law to be divided and scaled.

I think there must be something more.    The question then is, are there any special circumstances in this case to entitle the plaintiff to recover ?    And, if so, what are they ?

The solution of these questions, and of the whole case, in my opinion, depends upon the force and effect to be given to the bank resolutions set forth in the answer and the application of the statutes to them.—General Statutes, Chapter LV, Sections 1, 2 and 3.

The testimony, I think, has established that there has never been any settlement of the account between the parties.

There is one consideration which neither party has brought to the view of the Court, but which it seems proper to mention.

It may explain the difference between Mr. Whaley's books and the schedule of balances after April 1, 1864, referred to by the bank officers.    Is it not a fact that, on the first day of April, 1864,

the banks, in consequence of a public law as to the currency, funded all balances due their customers on that day, and if this was so, will it not explain why on Mr. Whaley's book there would appear a balance to his credit on that day, but none on the books of the bank ?

We are then to consider how the settlement is to be made.

On the sixth day of September, 1861, the bank gave public notice to its customers " that *after that date* all credits would be given and be payable in currency, in which term *Confederate Treasury notes* are included ;" and all deposits made after that date were in currency, and payable in currency.

The effect of this upon all future transactions is clear and plain enough, but as to credits, deposits, debts of the bank already existing, there is no pretence set up, no attempt made to put such debts within the resolution, or payable otherwise than according to original contract.

The implication is very conclusive that such debts were to remain as they then were. The caution and provision was for the future, not affecting the present or the past.

The bank saw fit to make a *rest* in the accounts of its customers, and to take a new departure as to future dealings. It had a right to do this ; but it could have no right, if it had pretended or attempted it, to change the character of its then existing debts or make them payable in Confederate currency.

It could not convert its debts to Joseph Whaley—a very large part of which had existed for several years—into a debt payable in " Confederate States Treasury Notes," unless by his clear consent.

It is not disputed, and may be assumed, that Mr. Whaley had notice of, and acquiesced in, these bank resolutions. Under them dealings of a new character and a new account were to commence between him and the bank, namely, an account, practically, as it soon turned out, in Confederate notes only. Of course the account was to be reciprocal in the same currency on each side. Mr. Whaley had no cause to understand otherwise.

The bank resolutions do not include in their meaning the old debt to plaintiff's testator, for which the bank received funds of the *par* value of gold. This debt could not be paid in Confederate notes without the testator's consent, and the testimony is very positive that he never did consent. The new departure was as to future dealings, not as to past transactions.

If thenceforth Mr. Whaley received credits, they were credits of Confederate Treasury notes. If he drew checks they were paid in the same currency, and when charged to his debit, each charge was for so much Confederate Treasury notes, and nothing else. They were not part payment on account of the old debt, but items in the new account.

· The same rule must apply to them as to the credits. Is there any reason why this should not be so? I can find none.

The resolutions of the sixth day of September, 1861, reduce all subsequent transactions between the bank and its customers to transactions in Confederate money or its equivalent, and they are within the words and meaning of Sections 1, 2 and 3 of Chapter LV of the General Statutes, which fix a way of determining the value in good money of "all debts created or contracted in Confederate States notes or with reference to" them. I am constrained to hold that the dealings between the bank and the testator after September 6th, 1861, were "in Confederate States notes, or with reference to them as a basis of value." The debts thereby created are subject to the provisions of Sections 1, 2 and 3 of Chapter LV of the General Statutes.

I am also of opinion that the debt due by the bank to Joseph Whaley, on or before the sixth day of September, 1861, had no "reference whatever to Confederate notes as a basis of value," and the bank is chargeable with it in funds of par value. I make the amount of this debt not less than $33,481.96, but if there is any doubt, it may be ascertained by including it, on motion of either party, in the order of reference to be made as to the subsequent accounts.

I agree with the ruling in the case from the No. Ca. Reps., that the general rule, as there stated, as to adjusting an account between a bank and customer, namely: "The first money paid in is the first money paid out," is not strictly applicable to a case like this, but it is to be regulated by the legislation enacted to meet such cases.

The account between the parties subsequent to the sixth day of September, 1861, is to be stated, and the value of each side of it to be ascertained by ascertaining the value of each item at its date according to the provisions of Sections 1, 2 and 3 of Chapter LV of the General Statutes.

The deposits on one side, and the checks on the other, upon the

footing up of the amount of these items, thus ascertained, a balance can be struck, and if the value of the deposits exceeds the value of the checks, the excess must be added to the debt of September 6, 1861.

If the value of the deposits is less than the value of the checks, then the difference is to be deducted from said previous debts and a final balance struck, for which balance, with interest from date of commencement of this suit, the bank is liable to the plaintiff. It is ordered that this cause be referred to W. J. Gayer, Esq., Special Referee, to take and state the account between the parties as herein directed, and that he do report the same, and also any special matter appropriate to the case.

. And on the 18th November, 1872, the Referee filed his report, as follows:

Under the decree in this case, I am directed, as Referee, "to take and state the account between the parties."

I. "The account between the parties, subsequent to the sixth day of September, 1861, is to be stated, and the value of each side of it is to be ascertained by ascertaining the value of each item at its date, according to the provisions of Sections 1, 2 and 3 of Chapter LV of the General Statutes."

II. "The deposits on one side and the checks on the other, upon the footing up of these items thus ascertained, a balance can be struck, and if the value of the deposits exceeds the value of the checks, the excess must be added to the debt of September, 1861."

III. "If the value of the deposits is less than the value of the checks then the difference is to be deducted from said previous debts, and a final balance struck, for which balance, with interest from the date of commencement of this suit, the bank is liable to the plaintiff."

I have endeavored to take the account as strictly as possible in accordance with the decree.

There was some difference of opinion as to two checks drawn by the plaintiff, one on the 27th February, 1864, and the other on the 3d March, 1864. After careful consideration, I am of the opinion that the check drawn the 27th February, 1864, was for $16,500, and the other, drawn 3d March, 1864, was for $1,488.05.

I respectfully report that the amount due the plaintiff, as per

statement appended hereto, is $26,185.31, which, with the interest thereon from the 30th June, 1870, the date of the commencement of the suit, shows an aggregate of $30,553.88, at the date of this report.

The report having been confirmed, with leave to the plaintiff to enter judgment thereon, the defendant appealed on the following grounds:

I. That the testimony in the case shows conclusively that there was no account existing between plaintiff and defendant to be stated, audited or settled, and His Honor should have so held.

II. That the testimony in the case shows that the account formerly open and existing between Joseph Whaley and the bank was closed and settled by Joseph Whaley prior to April 1st, 1864, and a settlement voluntarily made by Joseph Whaley, and acquiesced in by him for six years, cannot now be opened. The plaintiff is estopped by his own act, and the Court should have so held.

III. That His Honor erred in holding that the pass-book was the " best evidence of the transactions between the bank and its customers," for it is respectfully submitted—

1. That the pass-book is not a book of original entry, is not kept by the bank, and in law and practice is tested and corrected by the entries in the books of the bank.

2. That the pass-book is in law only a receipt or memorandum, and is open to explanation by evidence *aliunde*, and in this case was corrected by the entries in the books of the bank and other evidence.

IV. That His Honor erred in ruling that there had been no settlement between the bank and Whaley, for the books of the bank and other evidence in the case proved that Joseph Whaley had settled and closed his accounts with the bank by checking out all moneys to his credit in the bank.

V. That if the relation of debtor and creditor existed between Whaley and the bank, as maintained in the decree, then the evidence shows that the creditor had demanded payment of the debt; that the debtor had paid it in full; that the creditor had received payment without protest or exception, and closed the account and terminated business relations with the bank; and the transaction having been executed and closed between parties *sui juris*, is, under

the laws of this State, final, and the plaintiff is estopped from all action on said executed contract, and His Honor should have so held.

VI. That there is no evidence in the case that Mr. Joseph Whaley had ever in person, or through agents, protested against the reception of Confederate money, or objected to its receipt, or had ever received the same for what it was worth, and that the testimony of Mr. William Whaley, that Mr. Joseph Whaley so received it, is only his opinion of Mr. Joseph Whaley's intention, or is the report of a conversation between himself and Mr. Joseph Whaley, and does not in any way commit the bank, and in either event is incompetent to establish any claim, or to alter, modify, or destroy the acts of the parties and the legal rights arising therefrom, and His Honor should have so held.

VII. That the decree of His Honor affirms the doctrine that the payment of a running account, in Confederate money, is invalid, and the payment can be set aside, and the transaction opened and the account stated, although there was no fraud, covin or misrepresentation, and the parties were *sui juris*, and dealing with their own property, and payment was demanded by the creditor and was received by him in Confederate currency without objection. Whereas it is respectfully submitted that the decisions of the Supreme Court of the State from 1865 to the present date were and are uniformly to the contrary.

VIII. That where there is neither fraud, covin, nor misrepresentation, the payments in Confederate money made by the defendant to the plaintiff cannot be scaled, but are valid for the face thereof, and His Honor should have so held.

IX. That the suggestion in the decree that the difference between the plaintiff's and defendant's book can be explained by the Funding Act, is not only unsustained by the evidence, but is controverted by the evidence, for the testimony shows that the books of the bank were balanced to the 1st of April for the purpose of funding all balances, and that Joseph Whaley had no balance to be funded.

X. That the decree is against the law and the testimony.

*Porter & Conner*, for appellant.

*Campbell*, contra.

April 7, 1874. The opinion of the Court was delivered by

MOSES, C. J. We must hold the cause of action a mere money demand, arising out of a contract, and to be treated exclusively as

one of a purely legal character. The answer raised issues of fact, which were triable by a jury, and as no objection was made to the hearing of the case by the Judge, we must assume that a jury was waived in the formal mode required by the Code of Procedure. It is not disputed that on and before the 6th September, 1861, the testator, Joseph Whaley, had on deposit with the appellant a balance to his credit, in gold, or its equivalent, nor that after said date all the transactions between them were understood and agreed to be on the basis of Confederate States Treasury notes. That he had such a credit is conceded by the appellant, and it is admitted in the argument, on his behalf, that from the time named his deposits were made and his checks payable in what was known as Confederate currency. The 6th of September, 1861, is referred to as the date on which the change in their course of dealing commenced, because on that day the bank published a notice, the knowledge of which was admitted by Mr. Whaley, "that from and after that day all credits will be given and be payable in currency," in which it is not denied that Confederate Treasury notes were included.

The first, second and fourth grounds of appeal allege error in the Circuit Court in holding that there was any account existing between the parties to be stated, audited or settled, and in ruling that there had been no settlement between them. These involve questions of fact, which have been passed upon by that Court, and its conclusion in regard to them is not subject to our review. The views of this Court as to its jurisdiction "in cases in chancery," and as "a Court for the correction of errors at law," are so fully expressed in *Sullivan* vs. *Thomas*, 3 S. C., 331, that it is only necessary to refer to it to show that no appeal lies to this Court, in a case at law, to review the findings of fact in a judgment of the Circuit Court. Where the judgment, however, is totally devoid of facts to sustain it, the error then becomes one of law, and this Court has power to correct it. All the testimony was before the presiding Judge, and his inference from it is that there had been no settlement of the account before complaint made. This we must regard as an established fact in the case.

But the solution of this question by no means precludes the appellant from showing that nothing remained due to Mr. Whaley at the time of his demand, for, although there might have been no actual adjustment or settlement of the accounts between them, still their mutual transactions may have been of such a character as to

leave nothing due from one to the other. This was the matter to be decided by the Court, and it depended on mixed questions of law and fact. The principal among these arises out of the resolution of 6th September, 1861. That it was passed by the bank and brought to the notice of Mr. Whaley are conceded. Its construction was for the Court, and the conclusion of the Judge as to its effect on the mode by which the debtor and credit side of the account is to be adjusted, as it involves a proposition of law, is subject to review and examination here.

For the question thus raised, it is not necessary to determine whether the pass-book is "the best evidence of the transactions between the bank and its customers." It seems to have been so considered by the Circuit Judge in his discussion of the matter of the alleged final settlement by the bank and Mr. Whaley. In Grant on Bankers and Banking, 605, referring to *De Vaynes and Noble*, 1 Mer., 535, 536, it is said to be "the only general mode of stating and adjusting accounts between bankers and their customers." Mr. Morse, in his work on the same subject, at p. 481 to 485, in comparing the relative weight of the books of the bank and the pass-book in raising presumptions favorable to their correctness, rather accords to the latter a higher rank in the grade of testimony. We cannot doubt that as to a charge against the bank by a depositor, the credit in the pass-book is the highest evidence, and the same of an entry of a check to discharge *pro tanto* the credit side. That mistake may be shown on either in no way detracts from its high character or value. The error charged in the construction of the pass-book consists in not extending to the credit side due consideration of the effect of the resolution published by the appellants. In other words, that wherever a balance is struck on the book between the debtor and credit side, and a sum remains as a credit to Mr. Whaley, the result of all his deposits, diminished by the amount of his checks, that credit fulfills the meaning and intention of the resolution, and is subject to its effect. It does not so appear to us.

On the day that the resolution was promulgated Mr. Whaley had to his credit in the bank $33,481.96, in value equal to gold. It was the result of his deposits and checks up to that day, and if there had been no subsequent transactions between them it could not with any reason be contended that at any after period he would not be entitled, on demand, to be paid the amount in a currency

equal to that for which the bank was liable on the 6th of September, 1861. If he had, however, on the next day, drawn a check for $100, and the bank had, in his pass-book, struck a balance in his favor less the last check, the same argument would hold that the whole balance thus made would at once be converted into a liability on the part of the bank, to be removed by the payment of Confederate Treasury notes, no matter what might be their depreciation, when compared with gold or national currency. A result so unreasonable cannot.be found to have the sanction of law.

A fair and legitimate construction must apply it to future " credits." It was to have effect " from and after that day " on all credits which might be given out after that day. How could it act on credits for which the bank was before liable ? On what consideration could it found its right to convert a liability for money at par value into one to be paid and satisfied by a depreciated currency, and the character of that to be determined by itself? The words of the resolution seem to lead but to one conclusion, and in their application to Mr. Whaley, unless something has been done amounting to consent or acquiescence on his part to treat his whole running account with the bank as based only upon Confederate currency, we can see nothing in the judgment below that requires our interposition.

It is not necessary that this acquiescence should be by some express admission or act; when it amounts to a ratification of something done it may be equally conclusive, if necessarily and obviously implied from the conduct of the party to be bound by it. The course of dealing in regard to the subject-matter may often be the best and safest medium through which consent and compliance may be inferred. Does the conduct of Mr. Whaley in regard to his dealings with the bank afford evidence of such acquiescence ?

The argument assumes that, by striking the balance, a new and lower value was given to the deposits as they stood on 6th September, 1861. How could this consequence follow when nothing was in fact done that could produce such a result ? If a balance had never been struck between the two sides of the account in the pass-book, the sum due would nevertheless have appeared upon it. Striking a balance, from time to time, was a mere matter of convenience, making the difference in the amounts of the two sides at once apparent, and dispensing with the trouble of the addition of long lines of figures, but it in no way changed or varied the re-

sult to be ascertained by casting up all the items on each side and then deducting the smaller from the larger. No item of the same, to the credit of Mr. Whaley, on 6th September, 1861, could, by possibility, be converted into a new credit, or one to arise "from and after" a following day. It then had an existence—a credit to be given "from" and "after" could not be one, which had been given before. The credit of $33,481.96 was really due him on August 15, 1861. Between that date and the 6th of November following he made no deposit, and drew no check. On the day last named his pass-book was balanced, showing no change in his account as it existed on August 15, and yet it is claimed that, by merely prefixing the word "balance" to the credit side as it actually stood before the passage of the resolution, its whole character, as to value, was materially changed. To sustain the construction given to the resolution, in the argument on behalf of the bank, its language should have been of a different character, at least of a kind so plain and significant as to prevent any misapprehension on the part of its customers. To subject the amount due Mr. Whaley before the 6th September, 1861, to the provisions of the first Section, Chapter LV of the General Statutes, p. 310, would be treating it as a debt " created or contracted in Confederate States notes." It would determine its value by a provision intended only to affect obligations so arising. While it applies to a debt contracted with a view to Confederate money, as did that which resulted from the deposits and checks after the 6th September, 1861, we can see no reason why, in the particular cause before us, the Court is bound to give such a construction to the terms of the resolution as must change its whole tenor and apparent purpose, unless compelled to do so by some principle of law. Nor do we perceive such acquiescence on the part of Mr. Whaley, in the construction of the resolution for which the bank contends, as binds him to their conclusion. Was there any circumstance apparent from the book, with his view of the resolution, as was naturally calculated to prompt inquiry or explanation? According to the authorities, no inference can be drawn from passiveness or silence, either as to conduct or language of others. Unless the conduct was known or the language fully understood, the circumstances must be such as would naturally or properly call for action or reply from men similarly situated.—See 1 Green. Ev., Sec. 197.

We do not see in the conclusion we have reached any contraven-

tion of the rule applicable to a bank and its creditors, which regards " the first item on the debit side discharged or reduced by the first entry on the credit side." The rule remains unchanged in its application, but the value of each deposit and check is to be determined by the standard which the parties imposed upon it by their agreement. The acceptance of the Confederate money in payment of the checks must be held qualified by the resolution ; its letter and spirit must control the result which would otherwise follow such payments. Mr. Morse, in his work to which we have already referred, at page 28, concedes exceptions founded on " express contemporary arrangement or understanding."

It is urged that Mr. Whaley has himself afforded a construction to the language of the resolution by drawing at some time between November 6, 1861, and March 3, 1863, in excess of his deposits, unless his checks can be supposed to refer to the amount which, on November 6, 1861, he had to his credit, as well as to the deposits he afterwards made. So far from. exhibiting any inconsistency, it is reconcilable with the view which he took of the resolution of the bank. If it is correct, his supposed over-drafts were only to be valued at the rate of Confederate money, and discharged *pro tanto*, the balance due him in good money.

The other grounds of appeal object to the judgment of the Circuit Court " because it affirms the doctrine that the payment of a running account in Confederate money is invalid, and the payment can be set aside or opened, though there was no fraud, covin or misrepresentation." We do not see how this conclusion can be reached from anything which appears in the judgment to which it refers. In no regard, in affirming it, do we consider ourselves as at all impugning the principle, which we have maintained in several cases, that " a creditor, though entitled to demand payment in lawful money, may waive his right and accept any substitute he pleases, and his voluntary acceptance of such substitute, as payment, makes it so." It has no application here, because the resolution which we think affected all the transactions after 6th November, 1861, looked to a continuance of their dealings to be regulated, determined and settled in a mode which was to be consistent with the terms and conditions which it imposed.

The motion is dismissed.

WILLARD, A. J., dissenting. The cause of action was one " arising on contract for the recovery of money only."—Code, Section 152.

This is indicated by the form of the summons, and by the complaint, both in the stating part, and in the prayer for relief. The complaint cannot be regarded as, in substance, an equity proceeding in the nature of a bill to open a stated account on equitable grounds, for the requisites of such a bill are not set forth. The characteristics of such a bill were considered and stated by this Court in *McDow* vs. *Brown*, (2 S. C., 95,) nor is any other ground of recovery stated appropriate for the consideration of a Court of Equity. The plaintiff probably assumed that the cause of action was of an equitable character, for the reason that the amount of his recovery could not be ascertained without the taking of an account. The relation of defendant to the plaintiff was in no respect fiduciary, and an acccounting between them was not necessarily an equitable proceeding. The taking of an account is within the jurisdiction of the Courts of law as well as those of equity. The practice of referring issues of fact, in actions at law, where the examination of long accounts is rendered necessary, to referees, existed in New York prior to the adoption of its Code of Procedure. The Section of the Code of that State from which the provisions of the first sub-division of Section 295 of our Code were taken was designed to continue that practice under the Code of that State without essential change. It was not necessary for the plaintiff to leave unstated in his summons the exact amount for which he sought judgment. He was at liberty to insert in his summons and in his prayer for judgment such amount as he considered properly due to him. Such a statement was contemplated by the provisions of Sub. 1, Sec. 152, of the Code, prescribing the requisites of a summons in an action on a money demand arising on contract, although the want of a statement of a specified sum cannot prejudice the plaintiff at the present time. It cannot, on the other hand, change the essential character of his complaint. The issue joined was primarily triable by a jury.—Code, Section 276. How the case came to be tried before the Judge without a jury does not appear; but we are compelled to assume that the trial by jury was waived, as no objection on this account is brought before us by a proper exception. The action must be regarded as one arising at law, and we are limited to correcting any errors of law that may appear in the record.—*Sullivan* vs. *Thomas*, 3 S. C., 531.

The decision of the Circuit Judge places an erroneous construction upon the testimony furnished by the plaintiff's bank book, and

such error enters into and affects the whole judgment below. The plaintiff's case rested chiefly upon the proof afforded by his bank book, in which the various credits to which he was entitled were entered by the officers of the bank. The proper understanding of the force and effect of the credits thus given, as evidenced by the bank book, was a question of law for the Court to pass upon, and that we are competent to review. The error of the Circuit Court consisted in construing the credits as they stood in the bank book, without proper regard to the effect of the notice given by the defendants. That notice was given prior to September 6, 1861, to take effect on that day, and was that "all credits will be hereafter given, and be payable in currency, in which term the Confederate Treasury notes are included." A credit appears in the bank book previous to the date of the notice, which, it is not disputed, represented gold values. The first credit that appears after September 6, 1861, stands under date of November 6, 1861, and is "to balance, $33,481.96." It appears that this balance embraces all transactions prior to November 6, 1861, belonging to this account. This balance was on that day placed to the credit of plaintiff's testator. As the subsequent portions of the account rest upon this balance and upon deposits of currency, it becomes necessary to inquire whether, under the operation of the notice, that credit must be regarded as made with reference to values as existing in Confederate currency. The notice states that "all credits will be given and payable in currency." It explains what is meant by currency, making it to include Confederate treasury notes. The credit given by way of balance, November 6, 1861, was already one of the credits intended to be affected by the notice. In order to read "all credits," as excluding a certain class of credits, namely, balances of former accounts, carried forward as credits, the language employed by the parties must be limited by the nature of their dealings, or something attendant upon such transactions capable of entering into and modifying the terms employed. The inquiry is, then, whether the nature of the dealings between the parties or the attendant circumstances can operate to limit the terms of the notice in the manner stated. It must be assumed that at the time in question no very great disparity between gold and currency values existed, and we cannot assume that the vast disparity that subsequently occurred was in the contemplation of the parties. That the defendants desired that their accounts with

their customers should assume the single and simple form of currency accounts, may be reasonably assumed. That they intended by their notice to carry forward gold accounts as separate and distinct from currency accounts, is not warranted, in view of the fact that both parties continued to deal on the footing of a single account, embracing deposits made both before and after the notice. That defendant intended that the gold balance should be carried forward into the currency account without losing its essential character is hardly credible, and not a reasonable assumption. Such a mode of keeping the accounts would tend to create constant ground for dispute between themselves and their customers, on account of the intricacies arising from the constant change in the relation between gold and currency values, the solution of which could hardly be anticipated short of litigation. There is no construction that can be put upon the terms of the notice so as to sustain the plaintiff's view of the case but what would suppose that the defendant intended something utterly at variance with commercial usage and convenience, and too cumbersome to enter into the practical relations between the bank and its customers. On the other hand, assuming that the intentions of the defendant was that all balances struck after the 6th of September, 1861, should be regarded and treated as currency balances, no possible injury could result to the customers who had a gold balance on deposit at the time notice was given, for he could withdraw it, and, if he chose, convert it into currency and make a currency deposit. It is not reasonable to engraft upon the languge of defendant's notice terms leading to such intricacies as those involved in the plaintiff's view of the case. It is too late for the plaintiff to urge that the balance of November 6 was improperly stated, inasmuch as it did not allow the value of the gold deposits in currency. Many years of acquiescence in the correctness of this entry, with full notice, precludes any inquiry into its original propriety. The balance stated and credit, November 6, 1861, was, under the operation of the terms of the notice, to be regarded as a currency credit. Such being the case, it would follow that all subsequent transactions evidenced by the bank book, resting either on that balance or on currency deposits, must be regarded as representing values estimated upon the basis of the current value of Confederate treasury notes. A new trial should be granted.